IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| **PAMELA SWETT**, personal representative of THE ESTATE OF JOSEPH DAOUST, formerly resident of the Town of Wilton, County of Franklin, State of Maine | ) ) ) ) | CASE NO. |
| | ) | |
| Plaintiff, | ) | JUDGE: |
| | ) | |
| v. | ) ) | |
| | ) | **COMPLAINT AND JURY DEMAND** |
| **SOMERSET COUNTY**, State of Maine | ) | |
| | ) | |
| and | ) ) | |
| | ) | |
| **BARRY DELONG**, in his official and individual capacity as Sheriff of Somerset County, | ) ) ) ) | |
| and | ) ) | |
| | ) | |
| **JEFFREY JACQUES**, in his official and individual capacity as a Lieutenant in the Somerset County Jail, | ) ) ) ) | |
| and | ) ) | |
| | ) | |
| **BENJAMIN DUCHARME**, in his official and individual capacity as a Sergeant in the Somerset County Jail, | ) ) ) ) | |
| and | ) ) | |
| | ) | |
| **GERARD BUSSELL**, in his official and individual capacity as a Corrections Officer in the Somerset County Jail, | ) ) ) ) | |
| and | ) ) | |
| | ) | |
| **SCOTT LIBBY**, in his official and individual capacity as a Corrections Officer in the Somerset County Jail, | ) ) ) ) | |
| and | ) ) | |

1

**JOHN AND JANE DOES #1-5,** in their )
official and individual capacities as )
Corrections Officers in the Somerset County )
Jail, )
  )
and )
  )
**JOHN AND JANE DOES #6-10,** in their )
official and individual capacities as )
Employees, Administrators, Officials or )
Policymakers of Somerset County, )
  )
       Defendants. )

## I.      <u>PRELIMINARY STATEMENT</u>

1.     This civil rights case challenges the Defendants' failure to provide adequate mental and physical health care to an inmate suffering from a pulmonary hemorrhage while incarcerated in the Somerset County Jail (the "Jail"). Joseph Daoust ("Mr. Daoust") entered the Somerset County Jail on May 14, 2014. Two weeks later he died from an untreated pulmonary hemorrhage while he was housed in a segregation cell under frequent observation. Defendants knew Mr. Daoust was suffering the serious symptoms of pulmonary hemorrhage because they documented their observations of Mr. Daoust the night he died under their direct supervision. Defendants watched Mr. Daoust lie on the floor, begin to suffer from shallow breathing, become unresponsive, build up saliva, and start to twitch and quiver in his arms and legs. Although Defendants observed and documented Mr. Daoust's condition deteriorate and related his condition to supervising officers, they never entered his cell to check his condition and never contacted a member of the medical staff regarding his condition. Finally, when it was observed that he was no longer breathing and they could not determine if he was "living, breathing flesh,"

Defendants waited 19 minutes to enter Mr. Daoust's cell. It took an additional 8 minutes to perform CPR on Mr. Daoust, who was not breathing and had no pulse. Pamela Swett, the personal representative of Mr. Daoust's estate, brings this action to secure fair compensation and to encourage these and similar defendants to provide safe and effective medical treatment to inmates suffering from serious medical conditions.

## II.    JURISDICTION

2.   This claim is brought under the Civil Rights Act of 1871, 42 U.S.C. §1983. This Court has jurisdiction to hear this claim under 28 U.S.C. §§ 1331, 1343 (3) and (4). Jurisdiction over the state law claims is conferred by 28 U.S.C. §1367. Venue is proper in this Division.

## III.    THE PARTIES

3.   Pamela Swett, the girlfriend of Joseph Daoust, the deceased, and the mother of their four year-old son Noah, brings this suit as the personal representative of the Estate of Joseph Daoust for the benefit of his kin and heirs.

4.   Mr. Daoust was a resident of Wilton, County of Franklin, State of Maine.

5.   Defendant Barry DeLong was the Sheriff of Somerset County, State of Maine, at the time of the incident, and in his capacity as Sheriff of Somerset County with responsibility for the oversight and operations of the Somerset County Jail and is a "person" under §1983, and is being sued in his individual and official capacities

6.   Defendant Jeffrey Jacques was, at all times relevant, a Corrections Officer with the Somerset County Jail, is a "person" under 42 U.S.C §1983 and is being sued in his individual and official capacities.

7.   Defendant Benjamin Ducharme was, at all times relevant, a Corrections Officer with the

Somerset County Jail, is a "person" under 42 U.S.C §1983 and is being sued in his individual and official capacities.

8.      Defendant Scott Libby was, at all times relevant, a Corrections Officer with the Somerset County Jail, is a "person" under 42 U.S.C §1983 and is being sued in his individual and official capacities.

9.      Defendant Gerard Bussell was, at all times relevant, a Corrections Officer with the Somerset County Jail, is a "person" under 42 U.S.C §1983 and is being sued in his individual and official capacities.

10.     Defendants John and Jane Does # 1-5 were at all times relevant to this action employees or third-party contractors of the Somerset County Jail. They are sued in their individual and official capacities. Each John and Jane Doe is a person under 42 U.S.C. §1983, and each acted under color of state law at all times relevant to this case. Each violated Plaintiff's legal and constitutional rights by failing to provide Mr. Daoust constitutionally adequate medical care while he was incarcerated, which resulted in his injury and death.

11.     Defendants John and Jane Does # 6-10 were at all times relevant to this action employees, administrators, officials or policymakers of Somerset County. They are sued in their individual and official capacities. Each John and Jane Doe is a person under 42 U.S.C. §1983, and each acted under color of state law at all times relevant to this case. Each violated Plaintiff's legal and constitutional rights by failing to provide adequate training to the Corrections Officers which would have provided Mr. Daoust constitutionally adequate medical care while he was incarcerated, and that failure to do so resulted in his injury and death.

## IV. FACTS

**A. Joseph Daoust enters the Somerset County Jail as a pretrial detainee.**

12.     On May 28, 2014, Mr. Daoust died at the Somerset County Jail in the Town of

Skowhegan, County of Somerset, State of Maine.

13.     On May 16, 2014, Mr. Daoust arrived at the Jail as a pre-trial detainee being held on bail

for criminal charges in the Franklin County Unified Criminal Court.

14.     When an inmate is booked into the Somerset County Jail, a corrections officer asks him

or her a battery of questions. Included in these questions is a suicide risk evaluation.

15.     On May 16, 2014, Mr. Daoust's suicide risk was found to be medium.

16.     During booking Mr. Daoust also provided a personal medical history to a member of the

Jail nursing staff. Mr. Daoust reported that he had been receiving methadone treatment

and prescription clonazepam for anxiety. He also reported taking Seroquel and medical

marijuana.

17.     According to Lisa Cates, a nurse in the Jail, methadone and clonazepam are not permitted

in the Jail. Upon information and belief, Mr. Daoust did not receive these medications

while he was incarcerated.

18.     On May 17, 2014, Jail Medical staff performed an opiate withdrawal assessment on Mr.

Daoust that resulted in his placement on the Jail's "opiate detox program."

19.     Mr. Daoust was not assessed for benzodiazepine withdrawal. Benzodiazepine withdrawal

can cause agitation, hostility, aggressive behavior, paranoia and a host of severe physical

and emotional symptoms.

**B. Mr. Daoust's odd and aggressive behavior is noticed by the Jail's staff and prisoners.**

20.   On May 20, 2014, Lieutenant Phillip Campbell placed Mr. Daoust on administrative segregation because his aggressive behavior was worrying other inmates. Inmates told Lt. Campbell that they thought Mr. Daoust was "crazy" and "off his meds." Lt. Campbell determined that someone in the Jail's mental health department should evaluate Mr. Daoust before he could return to the pod.

21.   On May 21, 2014, social worker David Needham, who works in the Jail's mental health unit, assessed Mr. Daoust.

22.   During the assessment Mr. Daoust stated that he was bi-polar and took medication for it. He explained that he was not going to let other inmates "run their mouths" at him, but that he would follow the Jail's rules.

23.   Following his assessment, Mr. Needham determined that no further follow-up with Mr. Daoust was needed and he cleared Mr. Daoust to return to general population. Mr. Daoust chose, however, to remain in administrative segregation.

24.   On May 23, 2014 at approximately 7:44 p.m. Mr. Daoust refused to comply with orders from the Jail's correction staff during scheduled maintenance. Jail staff used a chemical agent, oleoresin capsicum, commonly referred to as "pepper spray" to gain his compliance and remove him from his cell.

25.   Mr. Daoust requested medical attention after being pepper sprayed. Jail Nurse Veilleux flushed his eyes with saline solution and noted that Mr. Daoust had elevated breathing and a reddened face.

**C. Mr. Daoust's behavior requires that he be placed on "special precautions."**

26.     On May 24, 2014, Mr. Daoust's behavior continued to deteriorate. As a result, Lieutenant

Campbell ordered Mr. Daoust to be placed on "special precautions."

27.     Special precautions required removing all items and clothing from Mr. Daoust's cell. He

was allowed only a tear-proof security smock or "turtle suit" and a blanket. He was also

placed on a "bag meal."

28.     Upon information and belief, corrections staff is required to observe prisoners on special

precautions every 15 minutes and memorialize what they see in their jail log.

29.     Mr. Needham from the Jail's mental health department, "Maria" from the Jail's medical

department and every shift supervisor in the Jail were informed of Mr. Daoust's

precautions status. Corrections officers working in the A pod where Mr. Daoust was

housed were also aware of Mr. Daoust's precautions status.

30.     Lt. Campbell's order notes that Mr. Daoust was increasingly aggressive towards Jail staff

and had escalating acts of self-harm. It also states that Mr. Daoust had not taken his

medications the night before and that that may be a contributing factor to his behavior.

31.     On May 26, 2014, Sergeant Grant sent Mr. Needham a Jail "Internal Staff Referral" due

to his concerns about Mr. Daoust's mental health. Sgt. Grant's referral states that Mr.

Daoust was "spiraling down hill mentally" and that he believed Mr. Daoust to be

"touched slightly." It also notes that Mr. Daoust had refused his medications the last two

evenings.

32.     May 26, 2014, at roughly 7:40 p.m., corrections staff attempted to search Mr. Daoust's

cell because they believed he possessed contraband.

33.     Mr. Daoust failed to comply with orders from corrections officers to be handcuffed. He

also refused to pass his security smock to them so that they could strip search him.

34.   Because Mr. Daoust refused to comply with orders to be handcuffed, Corrections Officials used a chemical agent, oleoresin capsicum, commonly referred to as "pepper spray" to gain his compliance.  Members of the corrections CERT team then extracted him from his cell with the assistance of an electronic control shield.

35.   After corrections staff gained control of Mr. Daoust they removed the contraband from Mr. Daoust's cell: left over food and toilet paper.

36.   Once again, Mr. Daoust requested medical attention for exposure to this chemical agent/pepper spray and a nurse flushed his eyes with saline. The nurse attending to him noted that Mr. Daoust's breathing was uneven.

37.   Mr. Daoust had no known respiratory or pulmonary disease and no evidence of any disease was discovered during the autopsy of his body.


**D. Mr. Daoust's emotional and physical condition deteriorate on May 27, 2014.**

38.   At 7:45 a.m. on May 27, 2014, Mr. Needham responded to Sgt. Grant's referral and attempted to assess Mr. Daoust. Mr. Daoust remained naked the entire time and was "agitated, yelling profanities and…refused to have an adult conversation about any issues he was having."

39.   Mr. Needham concluded the assessment, planning to return to complete it the next morning.

40.   Mr. Daoust refused his medications again on May 27, 2014.

41.   Mr. Daoust refused to eat lunch and dinner on May 27, 2014. He had refused four consecutive meals and he was placed on the Jail's hunger strike protocols.

42.   Throughout the day on May 27, 2014 Mr. Daoust's behavior continued to deteriorate. Jail corrections logs reflect that he repeatedly exposed his genitals to jail staff, requested to speak with President Obama, and shouted broken sentences at Jail corrections staff accusing them of fucking with him and of "playing games" with him.

43.   Mr. Daoust's behavior had become so bizarre that at 2:07 PM on May 27, 2014, Mr. Daoust surprises an officer because he "talked well" and "seemed to understand what I was talking about."

44.   On May 27, 2014 at 10:30 PM, Mr. Daoust is in his cell and has his last verbal communication with Corrections Officers.

45.   During that encounter, Mr. Daoust is lying on the floor of his cell, naked, and responds "Fuck you" to a command to use his bed.

**E. Mr. Daoust's breathing trouble begins and he is not provided medical care.**

46.   On May 27, 2014 at 11:12 PM Defendant Officer Bussell observes Mr. Daoust lying on the floor of his cell naked.

47.   On May 27, 2014 at 11:43 PM Defendant Officer Bussell observes Mr. Daoust lying on the floor of his cell naked.

48.   At some point late in the evening of May 27, 2014, Mr. Daoust begins to have difficulty breathing/shortness of breath.

49.   Shortness of breath is a physical manifestation of pulmonary hemorrhage that results from blood filling his lungs.

50.   Trouble breathing and pulmonary hemorrhage are serious medical needs that require immediate medical attention.

51.   At some point late in the evening of May 27, 2014, Defendant Officer Bussell sees that Mr. Daoust is having breathing trouble and he records it in his log.

52.   Without entering the cell to physically check on Mr. Daoust, Defendant Officer Bussell assumes that Mr. Daoust's breathing trouble is Mr. Daoust "trying to make himself hyperventilate."

53.   Defendant Officer Bussell did not contact the Jail's medical or mental health staff about Mr. Daoust's breathing difficulties.

54.   At 12:00 AM on May 28, 2014, Defendant Officer Bussell contacts Defendant Officer Libby and asks him to observe Mr. Daoust's breathing. Defendant Officer Libby observes Mr. Daoust's and confirms the breathing trouble.

55.   Defendant Officer Libby did not enter Mr. Daoust's cell to physically check his condition.

56.   Defendant Officer Libby did not contact the jail medical or mental health staff about Mr. Daoust's breathing difficulty.

57.   Defendant Officers Bussell and Libby see Mr. Daoust lying naked on the floor with breathing difficulty and assume he is "trying to make himself hyperventilate."

58.   On May 28, 2014 at 12:13 AM Defendant Lt. Jacques and Defendant Sgt. Ducharme are made aware of Mr. Daoust's breathing difficulty. Defendant Lt. Jacques and Defendant Sgt. Ducharme take no further action.

59.   At 12:27 AM Defendant Officer Bussell logs his observation of Mr. Daoust naked on the floor still short of breath and again assumes Mr. Daoust is trying to "make himself hyperventilate." No further action is taken.

60.   At 12:41 AM, Defendant Officer Bussell logs his observation of Mr. Daoust naked on the

floor still short of breath and again assumes Mr. Daoust is trying to "make himself hyperventilate." No further action is taken.

61.     At 12:56 AM, Defendant Officer Bussell logs his observation of Mr. Daoust naked on the floor still short of breath and again assumes Mr. Daoust is trying to "make himself hyperventilate." No further action is taken.

62.     At 1:11 AM, Defendant Officer Bussell logs his observation of Mr. Daoust naked on the floor still short of breath and again assumes Mr. Daoust is trying to "make himself hyperventilate."

63.     At 1:11 AM Defendant Officer Bussell also logs, for the first time, his observation of saliva building up in Mr. Daoust's mouth. Defendant Officer Bussell concludes that Mr. Daoust is doing this so he can inhale the saliva and harm himself. Defendant Officer Bussell does not contact the Jail's medical or mental health staff regarding Mr. Daoust's condition.

64.     At 1:11 AM Defendant Officer Bussell informs Defendant Lt. Jacques and Defendant Sgt. Ducharme that Mr. Daoust is still having breathing trouble and now is building up saliva to inhale and cause self-harm. In response, Defendant Lt. Jacques and Defendant Sgt. Ducharme take no further action.

65.     A build up of saliva in the mouth is a manifestation of the progressing severity of Mr. Daoust's pulmonary hemorrhage. The blood collecting in Mr. Daoust's lungs is preventing Mr. Daoust from getting sufficient oxygen to his blood, which results in brain damage and increased production of saliva.

66.     At 1:26 AM, Defendant Officer Bussell logs his observation of Mr. Daoust naked on the floor still short of breath and again assumes Mr. Daoust is trying to "make himself

hyperventilate." He also logs the build up of saliva in Mr. Daoust's mouth and his belief that Mr. Daoust is trying to harm himself. No further action is taken.

67. Between 1:05 AM and 1:34 AM, a camera in his cell shows Mr. Daoust's legs and arms quivering. He does not move after 1:34 AM. The quivering in Mr. Doaust's body is a manifestation of the brain damage he is suffering due to lack of oxygen.

68. At 1:42 AM, Defendant Officer Bussell logs his observation of Mr. Daoust naked on the floor still short of breath and again assumes Mr. Daoust is trying to "make himself hyperventilate." He also logs the build up of saliva in Mr. Daoust's mouth and his belief that Mr. Daoust is trying to harm himself. No further action is taken.


**F. Defendant Officer Bussell cannot determine if Mr. Daoust is "living, breathing flesh."**

69. At 1:48 AM, Defendant Officer Bussell requests assistance from Sgt. Ducharme because he "could not determine inmate Daoust as living, breathing flesh."

70. At 1:50 AM corrections officers Meunier, Libby, Moulton, Soares, and Sgt. Ducharme join officers Bussell and Simonds in A-Pod to assist with Mr. Daoust.

71. Upon information and belief, the Jail does not staff any medical or mental health workers in the Jail overnight.

72. Upon information and belief Nurse Cates, RN was the "on-call" nurse the morning of May 28, 2014.

73. At 2:00 AM Defendant Lt. Jacques called Nurse Cates at 2:00 AM and asked her to come to the Jail to check on Mr. Daoust.

74. During the phone call, Nurse Cates told Defendant Lt. Jacques to follow protocol and take Mr. Daoust's vital signs. In response, Defendant Lt. Jacques told her "it may be

more than that." Nurse Cates then headed to the Jail.

75.     At 2:07 AM, nineteen (19) minutes after Defendant Officer Bussell observes Mr. Daoust

        lifeless, corrections officers finally enter Mr. Daoust's cell and confirm he is

        unresponsive and not breathing.

76.     Mr. Daoust's lifeless body is removed from his cell and put in a wheelchair. His hands

        are cuffed behind his back and his ankles are shackled.


**G. Nurse Cates arrives at the Jail and Mr. Daoust receives medical care for the first time.**

77.     At 2:15 AM Nurse Cates arrives at the Jail and sees Mr. Daoust sitting shackled in a

        wheelchair. His face is blue and he has foam on the right side of his mouth. He is not

        wearing a blood pressure cuff. He wears a pulse ox on his hand, but upon information and

        belief it is being operated incorrectly by the corrections officers.

78.     Nurse Cates immediately checks Mr. Daoust for a pulse and does not find one. She

        quickly confirms Mr. Daoust is not breathing and that his eyes are fixed and dilated. He is

        unresponsive.

79.     At 2:17 AM Nurse Cates instructs Sgt. Ducharme to call emergency services and

        instructs the corrections officers to remove Mr. Daoust from the wheelchair and begin

        CPR.

80.     It takes at least twenty-nine (29) minutes from the time when Defendant Officer Bussell

        realizes that Mr. Daoust may not be alive and breathing for Jail staff to provide any life

        saving medical care to Mr. Daoust.

81.     At 2:22 AM, EMS arrives. At 2:46 AM, EMS responders pronounce Mr. Daoust dead.

82.     At 2:55 AM, the Office of the Medical Examiner and State Police are notified of Mr.

Daoust's death.

**H. The Medical Examiner performs and autopsy and determines the cause of death.**

83.  The Office of the Chief Medical Examiner investigated the death and conducted an autopsy of Mr. Doust, along with toxicology and histology testing.

84.  Dr. Mark Flomenbaum, Deputy Chief Medical Examiner, concluded that the cause of death was pulmonary hemorrhage of undetermined origin.

85.  In his investigation, Dr. Flomenbaum found markedly hemorrhagic lungs and cerebral edema, with no signs of cancer, disease, asthma, or trauma.

86.  The hemorrhagic lungs and cerebral edema would suggest that this death from pulmonary hemorrhage took place over a matter of minutes or hours, as opposed to being sudden.

87.  Mr. Daoust's medical needs, including breathing difficulties and their underlying cause, pulmonary hemorrhage are genuine and objectively serious.

88.  Medical Examiner Flomenbaum noted in the findings of his autopsy report that the shortness of breath, building-up of saliva, and twitching arms and legs were manifestation of the medical emergency Mr. Daoust was suffering from: pulmonary hemorrhage, and the shortness of breath, building-up of saliva, and twitching arms and legs were not the cause the pulmonary hemorrhage.

89.  The introduction of a chemical agent, such as oleoresin capsicum, commonly referred to as "pepper spray," has been known to cause pulmonary hemorrhage.

**I. Policies, Procedures and Culpable Conduct.**

90.  Defendant Corrections Officers Bussell and Libby, Defendant Sgt. Ducharme and

Defendant Lt. Jacques (altogether the "Corrections Defendants") were each deliberately indifferent to Mr. Daoust's serious medical needs. Each knew that Mr. Daoust had been exposed to a chemical agent and suffered from bipolar disorder. Each knew that Mr. Daoust was having trouble breathing and was hyperventilating for a number of hours. Each knew that Mr. Daoust began to build up substantial amounts of saliva that he appeared to be choking on to harm himself. Each knew that Mr. Daoust's legs were twitching and quivering. Despite this knowledge each failed to provide or obtain the necessary emergency medical care Mr. Daoust required. This failure by each was negligent, knowing, intentional, willful, wanton, reckless and deliberately indifferent. As a result, Mr. Daoust suffered extreme, extended pain and anguish and eventual death.

91.  For a period of one hour and forty-five minutes, the Corrections Defendants observed Mr. Daoust suffering serious breathing problems, appearing to choke on voluminous saliva, and have twitching, quivering legs. These Defendants made no effort to provide Mr. Daoust the emergency medical care his condition required. As a result, Mr. Daoust died from lack of treatment.

92.  The Corrections Defendants were also aware that Mr. Daoust was housed in segregation and placed on special precautions for, among other things, self-harming behavior. They also knew that he suffered from bipolar disorder and had been exposed to the chemical agent oleoresin capsicum, commonly referred to as "pepper spray."

93.  Defendant Somerset County and Defendant Sheriff Delong were also deliberately indifferent to the serious medical needs of Mr. Daoust by failing to train and supervise staff and failing to establish and implement jail policies, practices, customs and usages that trained and enabled Jail staff to adequately recognize and adequately respond to a

prisoner's serious medical needs, including those manifested by Mr. Daoust. This failure to train was a moving force behind Mr. Daoust's injury and death.

94.   Defendants Somerset County and Sheriff Delong were on notice that prisoners housed in the Jail may suffer from serious medical conditions like those suffered by Mr. Daoust, especially after being exposed to a chemical agent oleoresin capsicum, commonly referred to as "pepper spray." It is foreseeable that a prisoner in the Jail may develop breathing problems, and that failure to either provide the prisoner, or provide the prisoner access to, adequate and timely medical care could result in that prisoner suffering physical and emotional pain, serious injury and eventual death. Despite this, these Defendants failed to train corrections staff, including the Corrections Defendants, on how to recognize and respond to such medical emergencies. This was the moving force behind the constitutional deprivation suffered by Mr. Daoust.

95.   The negligent, reckless, willful, wanton, malicious and in bad faith conduct of all Defendants shocks the conscience, violates the standards of all decency in an evolving society, and betrays the trust that prisoners and the public place in jail staff when they deprive inmates of the means to take care of themselves making them dependent on the jail staff for all of their basic needs including but not limited to security and medical care.

## V.  FIRST CAUSE OF ACTION – 42 U.S.C. § 1983

96.   Plaintiff repeats and re-alleges each and every allegation contained in paragraph one through ninety-six as if expressly set forth herein.

97.   All Defendants have, under color of law, deprived Joseph Daoust, a pretrial detainee, of rights, privileges and immunities secured by the Eighth Amendment to the U.S.

16

Constitution as incorporated by the Fourteenth Amendment and applied to the States, including but not limited to the right to adequate medical care while incarcerated.

98.     Defendants Bussell, Libby, Ducharme, Jacques, and John and Jane Does #1 through #5 were each deliberately indifferent to Joseph Daoust's serious medical needs. Each witnessed and was aware of Mr. Daoust's serious medical needs for nearly two hours and each was deliberately indifferent to his medical needs by failing to provide him any medical care. As a result, Mr. Daoust suffered a long, painful death as blood filled his lungs, causing breathing problems, brain damage and death.

99.     Defendant Somerset County, Defendant Sheriff DeLong, and John and Jane Doe #6 through #10 were deliberately indifferent to Mr. Daoust's serious medical needs by failing to adequately train and supervise Jail staff to recognize and respond when prisoners suffer from obvious serious medical needs, including but not limited to after a prisoner has been exposed to the chemical agent oleoresin capsicum, commonly referred to as "pepper spray."  As a result, Mr. Daoust did not receive life saving measures in a timely manner and he died. The failure to train and supervise was deliberately indifferent and was a moving force behind the constitutional violation Mr. Daoust suffered. As a direct and proximate result of these Defendants' actions, Mr. Daoust lost his life.

100.    The rules, regulations, customs, policies and procedures of the Defendants regarding the diagnosis, treatment, and management of prisoners in the Jail with serious medical needs, especially when suffering from mental and physical illness were inadequate and unreasonable and were the moving force behind the constitutional deprivations suffered by Joseph Daoust.

## VI.    SECOND CAUSE OF ACTION – FAILURE TO TRAIN/COUNTY LIABILITY

101.    The Plaintiff repeats, re-avers, and realleges each and every allegation contained in paragraph one through one hundred as if expressly set forth herein.

102.    Somerset County, Sheriff Barry DeLong, and John and Jane Doe #6 through #10 are responsible for the training of Corrections Officers and insuring the adequate policies and procedures of the Somerset County Jail are developed and complied with by Corrections Officers in the Jail.

103.    Observing Corrections Officers and Supervising Corrections Officers were not trained on the proper action to take when making observations of a person having breathing problems or attempting to inflict self-harm.

104.    Observing Corrections Officers and Supervising Corrections Officers were not trained on the proper action to take when making observations of a person having breathing problems who had been exposed to Corrections Officers' chemical agent oleoresin capsicum, commonly known as "pepper spray."

105.    Observing Corrections Officers and Supervising Corrections Officers were not trained on the proper action to take when making observations of a person attempting to inflict self-harm who also had mental health issues, including but limited to bipolar disorder.

106.    Upon observation and belief that Mr. Daoust was having breathing issues, when knowing or should have known he had been exposed to chemical agent oleoresin capsicum and suffered from bipolar disorder, and attempting to "make himself hyperventilate," correctional officers took no action to intervene, which would have saved Mr. Daoust's life.

107.    Upon information and belief that Mr. Daoust was having breathing issues, when knowing

or should have known he had been exposed to chemical agent oleoresin capsicum and suffered from bipolar disorder, and attempting to "make himself hyperventilate," supervisory correctional officers took no action to intervene, which would have saved Mr. Daoust's life.

108. Upon information and belief that Mr. Daoust was having breathing issues, when knowing or should have known he had been exposed to chemical agent oleoresin capsicum and suffered from bipolar disorder, and attempting to "make himself hyperventilate," John and Jane Does #1 through #5 took no action to intervene, which would have saved Mr. Daoust's life.

109. The inactions and deliberate indifference of both observing Correctional Officers and Supervisory Correctional Officers (Defendants Ducharme and Jacques) working on May 28, 2014 violated Mr. Daoust's clearly established rights.

110. Somerset County, Sheriff DeLong, and John and Jane Doe #6 through #10 failed to meet their duties by failing to properly train and supervise Correction Officers under their authority and control on the law and policies and procedures concerning attention to medical needs of prisoners.

111. As a direct and proximate result of the failure of Somerset County, Sheriff DeLong, and John and Jane Doe #6 through #10 to train and supervise Corrections Officers under their control, Mr. Daoust suffered physical harm, severe emotional distress, conscious suffering and ultimately an untimely death.

WHEREFORE, the Plaintiff demands judgment against the Defendants plus punitive damages, attorneys' fees, interest, costs and such other and further relief as this Court deems just and proper.

## VII.    JURY DEMAND

Plaintiff demands a Jury on all matters triable to a jury in her Complaint.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that this Court:

A.    Award Plaintiff compensatory damages in an amount to be shown at trial;

B.    Award Plaintiff punitive damages in an amount to be shown at trial;

C.    Award Plaintiff reasonable attorney's fees, costs and disbursements;

D.    Pre and post judgment interest;

E.    Grant Plaintiff such additional relief as the Court deems just and proper.


Respectfully Submitted,


/s/ Jonathan Sahrbeck
Jonathan Sahrbeck, Esq. - Bar No. 9984
Terry Garmey & Associates
482 Congress Street, Suite 402
Portland, Maine 04101-4644